IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

GARY L. POLING,

        Plaintiff,

      v.                               Civil Action No. 1:08-CV-161

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    <u>Background</u>

      Plaintiff, Gary Poling, (Claimant), filed a Complaint on July 25, 2008 seeking Judicial

review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant, Commissioner of

Social Security, (Commissioner).[1]  Commissioner filed his Answer on December 12, 2008.[2]

Claimant filed his Motion for Summary Judgment on January 13, 2009.[3]  Commissioner filed his

Motion for Summary Judgment on February 10, 2009.[4]  Claimant filed a Response to

Commissioner's Motion and an Addendum to his own Motion.[5]  Commissioner filed a Response

---

[1] Docket No. 1.

[2] Docket No. 10.

[3] Docket No. 13.

[4] Docket No. 15.

[5] Docket Nos. 17 and 18.

to Claimant's Addendum on June 1, 2009.[6]  Claimant filed a Reply to Commissioner's Response

on June 8, 2009.[7]  Commissioner filed a Response to Claimant's Reply on June 10, 2009.[8]

B.    The Pleadings

     1.    Plaintiff's Brief in Support of Motion for Summary Judgment.

     2.    Defendant's Brief in Support of Motion for Summary Judgment.

     3.    Plaintiff's Response to Defendant's Motion for Summary Judgment.

     4.    Addendum to Plaintiff's Brief in Support of Motion for Summary Judgment.

     5.    Defendant's Response to Plaintiff's Addendum.

     6.    Plaintiff's Reply to Defendant's Response to the Addendum.

     7.    Defendant's Response to Plaintiff's Second Reply Brief.

C.    Recommendation

     I recommend that:

     1.    Claimant's Motion for Summary Judgment be **GRANTED IN PART** and

**DENIED IN PART** and the case be **REMANDED** with the following specific instructions

because the ALJ failed to fulfill his obligation to an unrepresented claimant by fully developing

the record: the ALJ is to obtain records from Dr. Nelson, Dr. Hoeldtke and Cheryl Farly, RN and

incorporate them into his decision.  The relevant time period at issue shall be between June 12,

2007, the alleged onset date, through March 12, 2008, the date of the unfavorable decision.

Claimant's motion is otherwise denied because substantial evidence supported the ALJ's RFC

---

[6] Docket No. 19.

[7] Docket No. 20.

[8] Docket No. 21.

assessment; he did not err in finding that the Claimant could return to past relevant work; he did not err by failing to consider Listing 4.04(C); and he made a proper credibility analysis.

2. Commissioner's Motion for Summary Judgment be **GRANTED IN PART** and **DENIED IN PART** for the same reasons set forth above.

## II. Facts

A. <u>Procedural History</u>

Claimant filed an application for Disability Insurance Benefits ("DIB") on June 12, 2007 alleging an onset of disability of June 12, 2007 (Tr. 125-127), due to heart disease, rheumatoid arthritis and type ii diabetes. (Tr. 149). The claim was denied initially on September 11, 2007 (Tr. 106-108). Thereafter, on October 1, 2007, Claimant filed a Request for Reconsideration. (Tr. 111). The claim was denied upon reconsideration on November 21, 2007 (Tr. 113-115). Claimant filed a written request for a hearing on December 3, 2007 (Tr. 116-117). Claimant's request was granted and a hearing was held on January 24, 2008 (Tr. 118, 51-103).

The ALJ issued an unfavorable decision on March 12, 2008 (Tr. 23-31). On April 7, 2008, Claimant filed a request for review of that determination. (Tr. 15). The request for review was denied by the Appeals Council on May 27, 2008 (Tr. 11-13). On September 19, 2008, the Appeals Council, after considering additional information, set aside their earlier action, but again denied Claimant's request for review. (Tr. 1-4). Therefore, on September 19, 2008, the ALJ's decision became the final decision of the Commissioner.

Having exhausted his administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.     Personal History

Claimant was born on July 29, 1946 and was sixty (60) years old as of the onset date of

his alleged disability and sixty-one(61) as of the date of the ALJ's decision.  (Tr. 61).  Claimant

was therefore considered a "person of advanced age who is closely approaching retirement," age

60 or older, under the Commissioner's regulations.  20 C.F.R. §§ 404.1563(e), 404.1568(d)(4),

416.963(e) (2008).  Claimant has a master's degree in history and political science. (Tr. 63).

Claimant taught American history and political science for thirty-seven (37) years prior to

retiring in 2007.  (Tr. 63-64, 150).

C.     Medical History

The following medical history is relevant to issues relevant to the disposition of the case:

**Ruby Memorial Hospital 3/9/2007-3/10/2007 (Tr. 222-238)**

Claimant was admitted to Ruby Memorial Hospital on March 9, 2007 with a history of coronary
artery disease.  He was admitted for coronary angiopathy and further intervention.  He had
significant right coronary artery disease without reversible ischemia.  He tolerated the procedure
well and had no complications.  He was ambulating and had no chest pain, shortness of breath,
nausea, vomiting, diaphoresis or palpitations prior to discharge.  He was given the following
discharge diagnoses:

1. Coronary artery disease.
2. Status post coronary artery bypass graft, 4 vessels, in 1996.
3. Insulin-dependent diabetes mellitus.
4. Hypertension.
5. Dyslipidemia.
6. Rheumatoid arthritis.
7. History of multiple coronary artery stents in the past.

His condition on discharge was as follows:

1. Ambulation: Independent.
2. Self-care ability: Full.
3. Cognitive status: Alert and oriented.

**Cindy Osbourne, DO Physical RFC Assessment 8/8/2007 (Tr. 239-247)**

Exertional Limitations:

Occasionally lift and/or carry 20 pounds
Frequently lift and/or carry 10 pounds
Stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday
Sit (with normal breaks) for a total of about 6 hours in an 8-hour workday
Push and/or pull limited in upper extremities

Postural Limitations:

Never climbing ladders/ropes/scaffolds
Occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching and crawling.

Environmental Limitations:

Avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, poor ventilation, etc. and hazards such as machinery, heights, etc.

Dr. Osbourne opined that his complaints are mostly credible but do not meet or equal any listing. Decrease RFC to light with limitations as indicated.

**Raymond Lim, MD Medical Evaluation 8/10/2007 (Tr. 248)**

Dr. Lim completed a case analysis and found that if the assessed "light" level RFC results in a med-voc allowance, then he would agree with the assessment. However, if not, he would need some detailed physical findings regarding his (reportedly) severe RA for review prior to a final assessment.

**B.G. Thimmappa, MD Consultative Examination Report 8/30/2007 (Tr. 249-254)**

Dr. Thimmappa gave the following Impression:

1. Coronary artery disease, post CABG, and post coronary anglogram and angioplasty status.
2. History of rheumatoid arthritis.
3. Diabetes mellitus.

**Subhash Gajendragadkar, MD Physical RFC Assessment 11/20/2007 (Tr. 255-263)**

Exertional Limitations:

Occasionally lift and/or carry 20 pounds
Frequently lift and/or carry 10 pounds

Stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday
Sit (with normal breaks) for a total of about 6 hours in an 8-hour workday
Push and/or pull unlimited other than as shown for lift and/or carry

Postural Limitations:

Never climbing ladders/ropes/scaffolds
Occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching and crawling.

Environmental Limitations:

Avoid even moderate exposure to extreme cold and hazards such as machinery, heights, etc.,
avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.

Dr. Osbourne completed a case analysis and reviewed all of the medical and non-medical
evidence, including the initial RFC completed by Dr. Osbourne. In addition to the cardiac
problems of severe CAD with multi-vessel coronary by-pass surgery and angioplasty, Claimant
has IDDM, symptomatic rheumatoid arthritis and morbid obesity. He modified the initial PRFC
as follows:

Add a diagnosis of arthritis

1. Occasionally lift and/or carry 10 pounds
2. Frequently lift and/or carry less than 10 pounds
3. Stand and/or walk at least 2 hours

All the limitations are due to the severity of CAD and arthritis.

**WVU UHA POC Progress Notes 1/4/2007-12/5/2007 (Tr. 264-269)**

Claimant presented for evaluation and based upon his exercise test performance, his estimated
annual cardiovascular mortality rate is low.

Impression: Moderately reduced left ventricular systolic function with inferior and basilar septal
akinesia. There is also anterior wall hypokinesia. There was ischemia in the anterior
distribution but the defect in the inferior wall is fixed. This suggests anterior wall ischemia with
viable myocardium and inferior wall scar.

**Levin & Associates, Martin Levin, M.A. Consultative Examination Report 2/20/2008**

Mental Status Examination:

Diagnosis:

| | |
|---|---|
| Axis I | V71.09 - No conditions present |
| Axis II | V71.09 - No conditions present |
| Axis III | Heart disease, rheumatoid arthritis, type II diabetes |

D.   Testimonial Evidence

Testimony was taken at a hearing held on January 24, 2008.  The following portions of the testimony are relevant to the disposition of the case:

ALJ    The right to be represented by an attorney or a nonattorney means that you can have someone help you with your claim.  They can make sure that I have all the medical evidence that I need, explain medical terminology to you, explain our rules and regulations to you, protect your rights, and make any requests or give any notices to me about the proceeding.  They cannot charge a fee or receive a fee unless I approve it.  Generally, they enter into a contract of 25 percent of your back pay or $5,300, whichever is less, but that's not automatic.  Now, as I indicated, I have to approve the fee, and the only way that, obviously, that a fee can be obtained is if you win your case.  If you appoint a representative, they also obtain certain records and make sure that I have everything I need to make a decision in your case.  Those are called out-of-pocket expenses when they pay hospitals and doctors for medical reports.  Out-of-pocket expenses are not attorney fees.  So, even if you obtained a representative, and you lost your case, you would still have an obligation, or an outstanding bill, from out-of-pocket expenses, over and above the issue of attorney fees.  Now, I don't know what your income level is.  There's been some indication that you're retired, so I don't know whether you would qualify for Legal Aide services, and I don't consider that to be a very viable referral, but you can contact Legal Aide if

you're having difficulty finding a representative.  Now, you can proceed today without a representative, and if it turns out that you talk about a medical record or a document that I don't have, I would have to obtain that before I make a decision.  If I feel you should be evaluated again by other physicians, I can direct that that be done before I make my decision.  Nonetheless, you need to know that a representative can present your case and your evidence in such a way that it's more beneficial to you.  Do you understand what I have just told you?

CLMT          Yes, sir.

ALJ           Do you have any questions?

CLMT          No, sir.

ALJ           Having indicated you have no questions, do you wish to proceed with your hearing today?

CLMT          Yes, sir.

                          *              *              *

ALJ           Okay.  Do you have any questions about any of these Exhibits?

CLMT          I have a comment on one.

ALJ           All right, sir, please.

CLMT          All rightie.  Dr. Thimoppa (Phonetic), on August the 30th, examined me. Now, on page 10 of the report, 4F, consultative examination report, about two-thirds of the way down the page, I'm quoting the paper, sir, heart - - "Heart is normal in size.  There's a regular sinus rhythm with no murmur."  Dr. John Hedad (Phonetic), in 1996, July the 22nd, when I had open heart surgery, quadruple bypass, at West Virginia University Hospital-Morgantown, said that my heart was too small, that my vascular system was too small.  Jumping ahead, sir, to

March the 9th, 2007, Dr. Brad Warden (Phonetic), at the same facility, said, your heart is too small.  Your vascular system is too small.  In the report of progress notes, I believe it is, I had a nuclear stress test on the 5th of December.  Now - -

ALJ          I have read your medical records, Mr. Poling.  what is the, what is the nature of your objection, here?

CLMT          The objection, sir, is, two cardiologists have said my heart is diminished in size.

ALJ          All right.

CLMT          And here, the doctor for Social Security says my heart is normal in size. And I would question Mr. - - or, Dr. Thimoppa's cardiovascular experience, without having seen any x-rays or anything of that nature, to come to that conclusion, sir.

*          *          *

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q          What is your date of birth?

A          7/29/46.

Q          How old are you today?

A          I am 61 years and - - I can't count that fast.

*          *          *

Q          Are you able to drive?

A          Yes, sir.

Q          Any limits on your driving?

A          No, sir.

*               *               *

A       No, sir.

Q       How far did you go in school?

A       Two master's degrees and about 60 hours beyond.

Q       All right, let's - - you graduated from high school?

A       Yes, sir.

Q       You attended college for four years?

A       Yes, sir.

                                *               *               *

Q       All right.  Now, my review of your record indicates that you retired from

teaching.

A       Yes, sir.

Q       When did you retire?

A       At the end of the school year, after I was told that my time was limited; go home

and enjoy what time I have left.

Q       All right, sir.  When did that occur?  The date of - -

A       Well, the day that it occurred was March the 12th, after I had had two stents

implanted on March the 9th - -

Q       What year was that, sir?

A       2007.  I went back - - I was still having difficulty breathing.  I went back to

Morgantown, and  - -

                                *               *               *

Q       All right.  When was your last work day, sir?

A       I didn't want to mess over the kids.  I finished the school year.  That would be approximately, I believe, June the 12th.

                        *               *               *

Q       When did you last work?  June the - -

A       June the 12th.

Q       Have you worked at any time after that date to the present?

A       No, sir.

                        *               *               *

Q       How many years have you taught?

A       Thirty-seven, sir.

Q       All right.  In the 15 years preceding the day you quit, or retired, or left work, generally, what were you doing?  Was it always the same type of work?

A       I was in the classroom teaching high school juniors and seniors American history; and also, an honors class in political science.  I supervised children, I took care of some administrative duties, I worked with athletic teams, I worked with the band, I also did homebound teaching in the evenings after school, and I also worked evenings for Fairmont State College at various facilities of their off campus.  Primarily in the prisons is where I started.

                        *               *               *

Q       Okay.  I guess the question is the administrative duties over and above teaching. What did that require you to do?

A       Well, supervising students, again; taking care of lockers and locker problems;

counseling children - -

                    *              *              *

Q       Now, when you taught outside of the classroom, you were doing some

extracurricular activities.  What sports were you coaching?

A       I was working with football and basketball.

                    *              *              *

Q       And you were paid extra for this?

A       No, sir, I was strictly volunteer.

Q       All right.  And the homebound teaching, did you have to drive to the homes?

A       Yes, sir.

Q       Okay.  And how long of that 15 years were you doing homebound?

A       Probably about seven years.

Q       Okay.  And the prison teaching, did you have to travel?

A       Yes, sir.  I went to FCI Morgantown, I went to the medium-security prison at

Prauneytown (Phonetic); and then, I was also at Phillipi, Grafton - -

Q       Okay.

A       - - Vo-Tech Centers for Fairmont State.

Q       Was that for the whole 15 years?

A       I taught for Fairmont State 18, sir.

Q       All right.  The prison work, how many years of the 15-year period did you do

prison work?

A       Well, if they wanted a class in prison, they called me to do it, and I was probably

five or six years in prison.

Q    Okay.  All right, and the - - I guess there was extra compensation for that?

A    Yes, sir.  They paid from 1,100 to start out to 1,600 when I finished.

Q    The manner in which you did your teaching job, classroom teaching, can you tell me how you did it?

A    Well, sir, I was on my feet.  I could  not sit.   I was around the room.  I was moving.  When - -

\*                    \*                    \*

Q    How heavy was your work, lifting and carrying throughout the day?

A    It wasn't like the construction I did years ago, but I would say probably 25, 30 pounds.

Q    What would be 25 or 30 pounds?

A    Books and so forth.  But the thing that was the real killer was the fact that I was on my feet, after 1996, on concrete floors; and with the rheumatoid arthritis, the nodules that were on my feet, my knees, my pelvis, it was, it was painful.

\*                    \*                    \*

Q    The date for my review begins June of '07 through January of '08.  I understand your pre-existing condition, but you have not presented any evidence to me of any surgery procedures in 1996.  I have no medical records on your case until you went to the hospital in March of '07.  That's all I know about you, sir.  I don't know what happened to you in '96 other than what your doctors have noted in their histories of you when you went to the hospitals.  So, what I'm trying to do first is get your work history, how you did your job, and what you were

required to do. Then, we'll talk about your medical conditions, and I'll give you the opportunity to take me back to 1996, when you had four bypasses.

A       Yes, sir.

                    *                    *                    *

Q       Now, tell me what limits your ability to work. What are your conditions that you keep trying to - - I understand your heart. I understand you had a CABG bypass in, in 1996 with four bypasses. Now, bring me up to date from there.

A       Okay.

Q       What are your conditions? When you made application, you told me that you had heart disease, you had rheumatoid arthritis, you have shortness of breath and fatigue, and the arthritis causes you joint pain and nodules. Now, is that what I understand your conditions to be?

A       Yes, sir.

Q       All right. Do you have any type of a mental condition?

A       Don't think so.

                    *                    *                    *

Q       Are you seeing a psychologist or a psychiatrist?

A       No, sir.

                    *                    *                    *

Q       And you have not been hospitalized for any mental condition?

A       No, sir.

                    *                    *                    *

Q      All right.  So, as I understand it, the medal records indicated that in 1996, you had

four bypasses.  Are you an insulin-dependent diabetic?

A      Yes, sir.

Q      Do you take - - do you give yourself injections?

A      Yes, sir.

Q      When did you start doing that?

A      2005/2006.  I don't really know, to be 100 percent honest, and I know I'm under

oath.

Q      What are your medications for your diabetes?

A      I'm on Humulin N; Humalog; Symlin, which is an injection; metformin.  Those

are the medications for my diabetes.

Q      And how many injections do you have to give yourself in a day?  How do you - -

A      I normally take three shots a day.

*                    *                    *

Q      Okay.  The last report that you gave me is in the record at 6F, which is the

University Health Associates at WVU, and it looks like the last visit was - - did you go in in

December of '07?

A      Yes, sir.  I had a nuclear stress test.

Q      And what was the results of that?

A      That I had much blockage, that the damage in there - - there were a total of 10

stents that I have had - -

Q      Okay.

A        - - and that some of them were blocking up; that the arteries, the capillaries, the veins are too small, and the heart is too small.

Q        Okay.  Is that in Dr. - - I guess the physician's name is - -

A        Dr. Warden.

*                    *                    *

Q        Where do you, where do you get the opinions about the size of your heart?  Is it congenital?  Has it been with you all of your life?

A        Apparently, sir.

Q        All right.  And Dr. Warden apparently saw you back in April of '07.

A        Yes, sir, for a check-up.

Q        All right.  How did that work out?

A        You know, how you doing?  Well I'm still here.

Q        Okay.

A        You know.  Nothing of any great magnitude either way, sir.

Q        He said your blood pressure was good, your pulse was good.  He wants you to continue your medical therapy: metaprolol, aspirin, and Plavix; and increase your Indur.  And the cholesterol is, you know, (INAUDIBLE).  Your hypertension, your blood pressure, is well controlled.  Is that, is that a pretty good picture of the way you are now?

A        Yes, sir.

*                    *                    *

A        And may I say that I do cardiac rehab three days a week at United Hospital.

Q        What does that consist of?

A       That consists of six exercise stations.  Do you want me to go through each one,

sir?

Q       How long have you been doing that?

A       I've been doing it since 1996.

Q       Okay.  Recently, you still going?

A       Yes, sir.

Q       Do you take any pain medication?

A       I have Darvocet.

                        *                       *                       *

Q       All right, let's talk about the arthritis.

A       All right, sir.

Q       Where are the nodules and the swellings that you're talking about?

A       Well here on my thumb, here, there - -

                        *                       *                       *

Q       Any surgeries on any of your problems?

A       In 1981, I had - - in your knee.  Cartilage removed.

                        *                       *                       *

Q       Did you have shortness of breath?

A       Yes, sir.

Q       Do you still have it?

A       Occasionally.

Q       Do you have - -

*             *             *

Q     Okay.  What makes your breathing worse?

A     Exertion.

*             *             *

Q     Any side effects from any of your medications?

A     Yes, sir.

Q     What are they?

A     The Symlin, which is an insulin drug, once you take it, it feels like you have been playing sports, and have gotten kicked in a particular part of your body; and the intense nausea that comes with it.

*             *             *

Q     Let me ask you some questions about your abilities to do things.   How far can you walk on level ground?

A     I go out to the track, which is rubberized, and I can normally get a mile.

Q     How long can you stand in one place?

A     Not that long, sir. When I was teaching, my desk was in the front of the room, and there were a lot of times that I either leaned against the desk or propped my posterior on the edge of the desk.

*             *             *

Q     How much can you lift on a regular basis?

A     Oh, probably 40 pounds.

Q     And sitting like you are now, how long are you able to sit?

A       Well, I can tolerate whatever I need to do.

                        *               *               *

Q       Well, you retired because of - -

A       Not - -

Q       - - your health.

A       Not by choice, sir.

Q       But you retired.

A       Yes, sir.

Q       You had 30 plus years in as a teacher.

A       Yes, sir.

                        *               *               *

Q       All right.  What else have you given up?

A       My - - I'm being redundant.  The teaching career, that was my life.

                        *               *               *

Q       Okay.  I think I have everything I need to have.  Is there any thing else you want

me to know before I question the vocational expert?

A       I'd like to tell you why I'm here today.

Q       Well, my, my question would be, before you do that, you know that you can take

retirement Social Security at age 62?

A       I'm aware of that, sir.

Q       All right.  And I don't see where a doctor has told you that you're terminal, and

you're going to die.  Is it in your medical record?  Can you point to a record that says you're

terminal?  I don't have one.  I've checked your records already, sir.

A       Okay.

Q       Because the, the, the regulations say your condition has to have lasted 12 months or longer where you've been off work, or likely to cause your death.  Now - -

A       May I speak, sir?

Q       Sure.

A       I was told by Dr. Warden - -

Q       Did he put it in a record, sir?

A       I, I don't see it.

Q       I don't, either.  So, now, I understand what you've told me already.  He told you to go home and enjoy life.  But he - - unfortunately, he doesn't tell us how many years you have left.  We - - none of us know how many years we have left.  But, but my question to you is, is there anything else you want me to know about your condition or your application that I haven't asked you, or that you feel that I need to know?

A       I tried to get a hold of Cleveland Clinic.

Q       I don't have any records of Cleveland Clinic.  Were you up there?

A       No, sir, I called them.

Q       Okay.

A       I have material here where I sent them my - -

Q       I, I, I need medical records of any treatment or examinations by Cleveland Clinic. Are you telling me you've been there?

A       They won't see me.

Q        All right, fine.

A        They told me that if - - I gave them my records, and they said, if we think we can help you, we'll get back in touch.  I called them three times.  Nancy, the chief cardiology nurse, called me in November, and she says, Mr. Poling, you're in a heck of a shape.  And Dr. Gustow Pederson (Phonetic), who is supposed to be a wiz kid from Sweden, won't even touch me.  Do you understand what it's like to feel - - to tell you that you're not going to be here much longer?

*                    *                    *

Q        Okay.  Now, with respect to the issue of transferable skills, anyone that's over the age of 55 who's performed skilled work, I need to ask you if there's skills that transfer to either semiskilled or sedentary type of work activity.

A        Yes, Your Honor.

Q        And what would the type of skills be?

A        Well, first of all, by virtue of his training and, and experience, Mr. Poling has excellent communication skills, both verbal and written.  Obviously, he has organizational skills, calculation skills, and computer skills, and social compatability skills, Your Honor.

Q        What type of job or job descriptions would accommodate this type of - - these type of skills?

A        Well, as an example, an individual with such skills could perform the position of a hotel clerk; a payroll and timekeeping clerk; in business, a billing and cost rate clerk; also, someone who is providing clerk services in shipping and receiving goods or items.  All of those are at the  - - the billing and payroll clerk, Your Honor, are, are at the sedentary level.  The hotel clerk is at the light level.  Also, another semiskilled position - - I'm sorry, skilled position, is that

of, of an interviewer, Your Honor, at the sedentary level.

$$*\qquad\qquad*\qquad\qquad*$$

Q       Okay.  Would you have statistics as to how many of those types of jobs would exist in the national or regional economy, I guess, in the order - - whatever order you wish to - - you, you gave me - -

A       Sure, I, I - -

Q       You gave me examples of five, I think, right?

A       Yes, yes, Your Honor.

Q       Okay.

A       I'll give them to you, Your Honor, if I may.

Q       Sure.

A       At the sedentary level, the billing and cost rate clerk, there are 333,000 jobs minimally in the U.S., and at least 1,800 in West Virginia.

Q       Okay.

A       Also, in the payroll and timekeeper clerk, at the sedentary level, in the U.S., 165,000 jobs, the U.S.; at least 900 in West Virginia.

Q       Okay.

A       Also at the sedentary level, the position of an interviewer, 82,000 jobs in the U.S., 700 in West Virginia.  And at the light level, the position of a hotel clerk, 164,000 jobs in the U.S., at least 1,200 in West Virginia.

Q       Okay.

A       And the shipping and receiving clerk, 900,000 jobs in the U.S., and at least 3,000

in West Virginia.

*           *           *

BY ADMINISTRATIVE LAW JUDGE:

Q      Now, with respect to these jobs that the skills that this gentleman has acquired from his education and his past work history, I would like your opinion, Mr. Panza, on the adjustment that one would have to make. As required by the regulations, the - - if I can find my, my notes. You've indicated that a teacher has skills that transfer, and you've described several types of jobs that an individual could perform. Now, using the criteria of none, very little, or more than little, what vocational adjustments would have to be made in terms of the tools, work processes, work setting, and the particular industry that you have described?

A      What was the classification after minimal, Your Honor?

Q      None, very little, more than little, none being no vocational adjustment would be required, very little vocational adjustment, or more than little vocational adjustment, to, to transfer these particular jobs, and if - - basically, some indication of what the adjustment would be required if you say, little, or, more than little. Do you understand the - -

A      Yes, I do, Your Honor.

*           *           *

A      It'd be my opinion that little adjustment would be necessary for adjustment to those occupations, Your Honor.

Q      In all categories?

A      Yes, uh-huh.

Q      And the nature of the adjustment that - - or, the facts that support your response

23

for little adjustment?  Can you provide that?

A       In utilizing those skills, the small amount of adjustment, or little amount of adjustment, would, would relate to adjustment to a different area, a different organization.

Q       I mean, in other words - -

A       Providing services such as is indicated here, as perhaps contrasted to teaching.

Q       All right.  And that's essentially the basis of your opinion that little adjustment would be required?

A       Yes, Your Honor.

                    *              *              *

Q       All right.  The profile: Mr. Poling is between the ages of 61 and 62.  That's defined in the regulations as advanced age.  Of course, he's got education.  He testified he has not only high school education, but a college degree; some master's training, degrees; and certified in - - high school teaching certificate in the state of West Virginia.  He has retired from there, because of his condition, after 30 years.  The State Agency in this case determined that an individual with the same or similar conditions as the claimant would have the ability to perform light work activity: lift 20 pounds occasionally, 10 pounds on a frequent basis; standing and walking could be accomplished about six hours in an eight-hour day with normal breaks; sitting could be accomplished six hours in an eight-hour day with normal breaks; and never climb any ladders, ropes, or scaffolding; only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  On the environmental limitations, consider avoiding concentrated exposure to cold temperatures; concentrated exposure to fumes, dust, odors, gasses, and pollutants; a concentrated exposure to the hazards of moving plant machinery and unprotected heights.

That's taken from the record at Exhibit 2F. Looking at the claimant's past work, would such an assessment provide for the past work for this hypothetical person if the past work was a professional teacher?

A        Yes, Your Honor.

Q        All right. Assume the testimony of the claimant is completely credible, supported by his medical evidence of record, so, not only does he have the ability no longer to do his teaching work as he performed it and as generally performed, but would have no ability to do even some of the other jobs that you identified as skilled or semiskilled involving transferable skills. His ability to maintain attention, concentration, and pace rises to the level of marked. By marked, I mean he cannot stay on task 10 percent or more of a workday. He would have absenteeisms that would exceed those which are acceptable in the workplace from a vocational standpoint. If that would be the case, would there be any jobs that you could identify?

A        No, Your Honor. If that would be the case, there would be no jobs.

                    *                    *                    *

ALJ            Mr. Poling, I, I, I appreciate everything you're telling me, and all of your comments are noted and taken into consideration by me. But I'm concerned about something. I'm concerned about your anxiety and your mental status, and in order for me to make a proper decision in this case, I'm going to direct that you see a psychologist or a psychiatrist.

CLMT        Are you going to pay for it?

ALJ            I do not pay for it, sir. The Agency takes care of it.

                    *                    *                    *

ALJ            Mr. Poling, I have been a practicing attorney in the state of West Virginia

25

for 30 years.  I have been an Administrative Law Judge for four years.  I have had the benefit of some great teachers.   I need to make an intelligent decision in your case.  You have not presented your case properly before me.  I will present and request that you have the psychological evaluation.  I urge you to cooperate.

        CLMT        Sir, I have cooperated since I walked in this door.

                        *        *        *

        ALJ        Do you know how, how old some of the people that still work are today?

        CLMT        Yes, sir, but they were not told by their cardiologist - -

        ALJ        Mr. Poling, it is not in your record.  There is no written documentation to what you're telling me from a physician.

        CLMT        Could I add that to my record if - -

        ALJ        You may - - you know, it's probably going to be two or three months before I get the report back from the psychologist.  I urge you, if you need to bring your medical records up to date, that you do so.  And if there's any that you feel that we have not received that we should acquire, I will make sure that that's done.  But you're free to explore any further medical that you wish to, but I'm going to - -

        CLMT        Is there any use?

                        *        *        *


E.       <u>Lifestyle Evidence</u>

        The following evidence concerning claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how

claimant's alleged impairments affect his daily life:

- Takes care of his puppy (Tr. 174)

- Personal care is painful, but Claimant is able to feed himself (Tr. 174)

- Watches television (Tr. 175)

- Reads (Tr. 175)

- Falls asleep between 9pm and 10pm (Tr. 175)

- Does small errands around the house, like washing dishes, dusting, vacuuming (Tr. 176)

- Attends cardiac rehab class three times per week (Tr. 176)

- Rarely prepares meals, but will make a sandwich occasionally (Tr. 177)

- Mows the lawn (Tr. 177)

- Claimant is in and out of the house many times in the course of the day (Tr. 178)

- Claimant likes to watch the animals (Tr. 178)

- Claimant is able to drive alone (Tr. 178)

- Claimant shops for groceries and home products (Tr. 178)

- Pays bills, counts change, handles a savings account and uses a checkbook (Tr. 178)

- Spends time with others and occasionally eats out with friends (Tr. 179)

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the ALJ made multiple errors.  Specifically, Claimant avers that the ALJ failed to fulfill his legal obligation to an unrepresented claimant.  Claimant alleges the ALJ failed to develop the record because he failed to obtain treatment records and therefore could not rely on the treatment records at the remaining steps of the sequential evaluation process.  Second,

Claimant maintains that the ALJ's residual functional capacity assessment ("RFC") is not supported by the record. Next, Claimant argues that the record does not support the ALJ's finding that he could return to his past relevant work. Claimant then maintains that the ALJ erred by failing to adequately consider the possibility that Claimant's condition met or equaled Listing 4.04(C). The next argument Claimant makes is that the ALJ failed to correctly consider Claimant's credibility. Lastly, Claimant argues that the Appeals Council erred because it failed to consider the treating source reports submitted to the Council for the first time.

Commissioner maintains that the ALJ adequately developed the record with respect to Claimant's diabetes and arthritis. Commissioner avers that the ALJ adequately addressed Listing 4.04C. Commissioner argues that substantial evidence supports the ALJ's RFC determination. Commissioner maintains that the ALJ properly addressed Claimant's credibility. And finally, Commissioner argues that the Appeals Council did not err in addressing Claimant's new evidence.

B.    The Standards.

1.    Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts

showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

2.  <u>Judicial Review</u>. Only a final determination of the Commissioner may receive judicial review. <u>See</u> 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3.  <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.  <u>Social Security - Medically Determinable Impairment</u>. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.  <u>Disability Prior to Expiration of Insured Status- Burden</u>. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423C; <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.  <u>Social Security - Standard of Review</u>. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the

Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the Claimant can perform her past work; and 5) whether the Claimant is capable of performing any work in the national economy.  Once Claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the Claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the Claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10.     <u>Social Security - Residual Functional Capacity</u>.  A Residual Functional Capacity is what Claimant can still do despite her limitations.  20 C.F.R. §§ 404.1545, 416.945.  Residual Functional Capacity is an assessment based upon all of the relevant evidence.  <u>Id</u>.  It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition.  <u>Id</u>.  Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used.  <u>Id</u>.  These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities.  <u>Id</u>.  This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments.  <u>Id</u>

C.     <u>Discussion</u>

<u>Claimant's Subsequent Application</u>

Following the March 12, 2008 ALJ denial, Claimant filed a subsequent application for benefits on June 3, 2008.  On April 8, 2009, the attorney advisor Office of Disability Adjudication and Review issued a fully favorable decision, finding Claimant disabled as of March 13, 2008, the day after the ALJ's decision in this case.  Claimant finds this subsequent decision troubling and, pursuant to <u>Reichart v. Barnhart</u>, 285 F.Supp.2d 728 (S.D. W.Va. 2003), asks the Court to remand this claim for further proceedings.

The United States District Court for the Southern District of West Virginia recently discussed the meaning of <u>Reichard</u>.  <u>Bradley v. Barnhart</u>, 463 F.Supp.2d 577 (S.D. W.Va. 2006).  Judge Copenhaver wrote,

...Reichard stands for the proposition that an award based on an onset date coming in immediate proximity to an earlier denial of benefits is worthy of further administrative scrutiny to determine whether the favorable event should alter the initial, negative outcome on the claim.

Id. at 580-581.

In this case, Claimant has been found by the Commissioner to be not disabled on March 12, 2008, but disabled on March 13, 2008. Claimant argues that this alone warrants a remand. The Court agrees. While it is true that the Attorney Advisor's decision relies, at least in part, on evidence obtained months after the ALJ's decision in this case, it is clear that Claimant's condition had changed little, if any, between the two decisions. In the new favorable decision, Commissioner found Claimant suffered from "rheumatoid arthritis" instead of a "history of rheumatoid arthritis." The Commissioner, in the favorable decision, found that Claimant had a "long history of coronary artery disease" evidenced by cardiac procedures "in March 2007." The Attorney Advisor was not relying on new evidence when he made his favorable decision.

Pursuant to Reichard and Bradley, where the courts found that the second favorable adjudication was based on evidence relating to the time period before the prior adjudication denying benefits, this Court hereby remands this case for further administrative scrutiny with the specific instruction that the time period at issue be limited to June 12, 2007, the alleged onset date, through March 12, 2008, the date of the unfavorable decision.

Notwithstanding the Court's above remand order, the Court will nevertheless specifically address Claimant's arguments below.

<u>The ALJ Committed an Error of Law Because He Failed to Fulfill His Legal Obligation to an Unrepresented Claimant</u>

Claimant argues that the ALJ had a heightened duty to assist him in the proper

presentation of his claim and that the ALJ failed to fulfill this duty.  Commissioner maintains that the ALJ fulfilled this duty and adequately developed the record with respect to Claimant's diabetes and arthritis.

An ALJ has a duty to explore all relevant facts and inquire into issues necessary to develop the record.  <u>Cook v. Heckler</u>, 57 F.2d 1168, 1173 (4th Cir. 1986).  However, the ALJ "is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record."  <u>Bell v. Chater</u>, 57 F.3d 1065, 1995 WL 347142, at *4 (4th Cir. 1995) (quoting <u>Clark v. Shalala</u>, 28 F.3d 828, 830-831 (8th Cir. 1994)).

This Court recently addressed the issue in <u>Stahl v. Commissioner</u>, Slip Copy, 2008 WL 2565895 (N.D. W.Va., 2008).  There, the Court found that an ALJ has a heightened duty to ensure the claimant receives a full and fair hearing as guaranteed by 20 C.F.R. §§ 404.927, 416.1441.  <u>Sims v. Harris</u>, 631 F.2d 26, 27 (4th Cir. 1980).  Such a duty includes helping the claimant develop her case and ensuring all the facts are fully explored.  <u>Id.</u>; <u>Walker v. Harris</u>, 642 F.2d 712, 714 (4th Cir. 1981).

Claimant alleges that the ALJ could not have adequately considered his diabetes or arthritis because he did not obtain any of the treatment records related to them.  Claimant maintains that the treatment records before the ALJ dealt almost entirely with Claimant's cardiac condition.

The Court finds that the ALJ failed to properly assist the pro se claimant in this case and his failure to adequately develop the record is cause for remand.  The ALJ was well aware that Claimant had failed to properly present his case.  Furthermore, the ALJ specifically asked Claimant who his treating physician was.  Claimant answered that it was Kelly Nelson,

Medbrook Medical Center (Tr. 72-73). Along with multiple references in the record to Dr.

Nelson, the record also contained references to Dr. Hoeldtke, Claimant's treating

endocrinologist. Despite these references, the ALJ failed to obtain any records from these

individuals. On remand, the ALJ is ordered to obtain records from Dr. Nelson, Dr. Hoeldtke and

Cheryl Farly, RN.

The ALJ Erred Because the RFC is Not Supported by the Record

The fact that the ALJ failed to fully develop the record, standing alone, does not mean

there was not substantial evidence to support his RFC finding.

A Residual Functional Capacity is what Claimant can still do despite her limitations. 20

C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of

the relevant evidence. Id. It may include descriptions of limitations that go beyond the

symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical

condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or

other persons, of Claimant's limitations may be used. Id. These descriptions and observations

must be considered along with medical records to assist the SSA to decide to what extent an

impairment keeps a Claimant from performing particular work activities. Id. This assessment is

not a decision on whether a Claimant is disabled, but is used as the basis for determining the

particular types of work a Clamant may be able to do despite their impairments. Id.

Here the ALJ found that the Claimant maintains the RFC to perform light work with

additional postural limitations and limitations with climbing, and exposure to cold. (Tr. 30).

Light work involves lifting no more than twenty pounds at a time with frequent lifting or

carrying of ten pounds, and standing or walking for six to eight hours in a work day. 20 C.F.R. §

34

404.1567(b); Social Security Ruling (SSR) 83-10, *available* at 1983 WL 31251, at *5. It is solely the responsibility of the Commissioner to determine an RFC. 20 C.F.R. §§ 404.1527(e)(2), 404.1546(c).

Despite the fact that the ALJ failed to adequately develop the record, and the additional evidence might have had some bearing on Claimant's RFC, this Court cannot say that the ALJ's RFC finding was not supported by substantial evidence. In fact, the record is riddled with evidence that Claimant can perform light work. He admitted that he can lift up to forty pounds and walk a mile at a time. (Tr. 82-83). Upon examination, Dr. Thimmappa found that he has full muscle strength, full range of motion in his upper arms, and negative straight leg raising. (Tr. 252-54). Claimant continued to work following surgery until he retired at the end of the school year. (Tr. 64-65, 150, 174). Claimant manages his personal hygiene needs, cares for his library, performs chores around the house, drives his wife to the store, occasionally washes laundry, drives a riding mower and cares for a puppy. (Tr. 85-87, 201). He exercises three times per week, attends ball games and shops at stores. (Tr. 204-05). In addition to this, Dr. Osbourne provided an RFC assessment finding that Claimant can perform light work. (Tr. 240).

Substantial evidence supports both the ALJ's finding that Claimant can perform light work as well as his alternative finding that Claimant can perform sedentary jobs.

<u>The ALJ Erred in Finding That Claimant Could Return to His Past Relevant Work</u>

Claimant's argument here is essentially the same as his argument above that the ALJ's RFC finding was not supported by substantial evidence. This Court found that the ALJ's RFC finding was supported by substantial evidence. The RFC finding indicated that Claimant can perform light work. At the hearing, the vocational expert ("VE") testified that Claimant's past

relevant work as a teacher was classified as a light job by the Dictionary of Occupational Titles

("DOT"). (Tr. 31). Therefore, the evidence supports the ALJ's conclusion that Claimant could

return to his past relevant work.

<u>The ALJ Erred Because He Failed to Adequately Consider Claimant's Condition Met or Equaled Listing 4.04(C)</u>

Claimant argues that he likely met Listing 4.04(C) or at least equaled it and the ALJ

failed to explain his rationale when determining that Claimant does not meet or equal the listing.

<u>Cook v. Heckler</u>, 783 F.2d 1168, 1172 (4th Cir. 1986).

Here, the ALJ found that Claimant did not meet or equal Listing 4.04(C). Rather than

conduct an exhaustive, thorough analysis of the Listing, the ALJ compared the Claimant's

symptoms to the requirements in a summary fashion. An ALJ is not required to identify the

relevant listing and compare its criteria to the claimant's symptoms unless there is *ample*

evidence that the condition meets or equals the listing. <u>Quesenberry v. Astrue</u>, Civ.A.No. 1:06-

116, 2007 WL 2965042, at *15 (W.D. Va. Oct. 10, 2007)(citing <u>Russell v. Chater</u>, No. 84-2371,

1995 WL 417576, at *3 (4th Cir. July 7, 1995)); <u>Huntington v. Apfel</u>, 101 F.Supp.2d 384, 391 n.7

(D. Md. 2000).

Listing 4.40(C) requires that there be an absence of a timely exercise tolerance test

because such a test would present a significant risk. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §

4.04C. Here, Claimant had exercise stress tests on March 2 and December 5, 2007 (Tr. 224-25,

264). Therefore, Claimant could not possibly meet or equal Listing 4.04(C), as the ALJ correctly

found.

<u>The ALJ Erred in His Credibility Analysis By Citing to Only Portions of the Record</u>

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints in Craig, 76 F.3d at 585. Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. Id. at 594. The ALJ must "expressly consider" whether a claimant has such an impairment. Id. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled. Id. at 595. While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. Id. However, subjective symptoms "may not be dismissed merely because objective evidence of the pain itself . . . are not present to corroborate the existence of pain." Id. As long as the ALJ followed the legal mandates of Craig, his factual determinations will be upheld so long as they have substantial evidence to support them. Milburn Colliery Co., 138 F.3d at 528. A decision with substantial evidence adequately explains its reasoning. Id.

When evaluating the credibility of a claimant's subjective complaints, the ALJ may consider discrepancies between the severity of the complaints and the treatment sought. In Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994), the Fourth Circuit stated that "an unexplained inconsistency between the claimant's characterization of the severity of her condition and the treatment she sought to alleviate that condition is highly probative of the claimant's credibility." Furthermore, "A claimant's allegations of disabling pain may be discredited by evidence that he or she has received minimal medical treatment and/or has taken medications, other than aspirin, for pain only on an occasional basis." Williams v. Bowen, 790

F.2d 713, 715 (8th Cir. 1986). Thus, it is appropriate "for the ALJ to consider the level and type of treatment the plaintiff sought and did or did not receive in determining what weight to accord" to subjective allegations. Baldwin v. Barnhart, 444 F. Supp. 2d 457, 464 (E.D.N.C. 2004).

Here, the ALJ appropriately analyzed Claimant's subjective complaints under this framework and found that he lacked credibility given the timing of his application, his work history, and the medical evidence. (Tr. 30-31). Claimant maintained that he had worked through ;ain for many years, but, coincidentally, did not apply for benefits until the day he retired. (Tr. 125, 165). Furthermore, Claimant claims he was told to "go home and enjoy life" after his March 2007 surgery. (Tr. 64, 181, 182). However, he did not immediately stop working after his surgery. He instead chose to finish out the school year which lasted approximately three more months. (Tr. 64-65, 165). In addition, Dr. Warden's notes do not state that Claimant should retire or that he has limited time. Instead they say he should maintain an active lifestyle, he can engage in routine activity, and he is a low mortality risk. (Tr. 222, 224-25). Finally, the objective findings and Claimant's post-retirement activities indicate that he is not as restricted as he claims. (Tr. 85-87, 174, 176, 201, 204-05, 249-54).

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 889 (4th Cir. 1984) citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference. See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong'" Powers v.

Apfel, 207 F.3d 431, 435 (7th Cir. 2000) citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990).

The ALJ is in the best position to observe Claimant's demeanor during the hearing and evaluate his credibility. The ALJ stated that "claimant is not entirely credible, particularly with regard to his allegations of pain, limitations, and overall disability." (Tr. 30). The ALJ noted the peculiar timing of Claimant's application. (Id.). The Claimant did not show that the ALJ's credibility determination was patently wrong. Therefore, the ALJ properly analyzed Claimant's credibility.

<u>The Appeals Council Erred Because it Failed to Correctly Consider Treating Source Reports Submitted to the Appeals Council for the First Time</u>

The Court has addressed this issue above in response to Claimant's argument that the ALJ failed to fully develop the record. The Court declines to address the issue here except to reiterate that on remand, the ALJ is to review the records of Dr. Nelson and Cheryl A. Farley, R.N.

**IV. Recommendation**

For the foregoing reasons, I recommend that:

1.     Claimant's Motion for Summary Judgment be **GRANTED IN PART** and **DENIED IN PART** and the case be **REMANDED** with the following specific instructions because the ALJ failed to fulfill his obligation to an unrepresented claimant by fully developing the record: the ALJ is to obtain records from Dr. Nelson, Dr. Hoeldtke and Cheryl Farly, RN and incorporate them into his decision. The relevant time period at issue shall be between June 12, 2007, the alleged onset date, through March 12, 2008, the date of the unfavorable decision. Claimant's motion is otherwise denied because substantial evidence supported the ALJ's RFC

assessment; he did not err in finding that the Claimant could return to past relevant work; he did not err by failing to consider Listing 4.04(C); and he made a proper credibility analysis.

2.        Commissioner's Motion for Summary Judgment be **GRANTED IN PART** and **DENIED IN PART** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: July 21, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE